UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT AUGUST, GEORGE AUGUST,<br>    Plaintiffs,<br><br>        v.<br><br>CITY OF BRIDGEPORT, JOSEPH<br>GALLAGHER, KIMBERLY A. BIEHN,<br>JOHN HOLTZ, MICHAEL SIGRIST,<br>CHRISTOPHER BORONA,<br>    Defendants. | No. 3:10-cv-00456 (JAM) |

**RULING GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

One day in January 2009, the police in Bridgeport, Connecticut received word that Robert August ("Robert") had threatened to kill his brother Carl August ("Carl"). When the police went to Robert's home to investigate, he met them at his door while holding a loaded gun. Although he did not threaten the police with the gun, he told the police that he and his other brother, George August ("George"), had many more guns in the home. The police eventually applied to a state court judge for a warrant to search Robert and George's home. Dozens of firearms were seized, but neither Robert nor George was charged with a crime.

Robert and George have now filed this lawsuit under 42 U.S.C. § 1983, principally claiming that the police violated the Fourth Amendment because they misled the state court judge in the affidavit for a search warrant. I conclude there is no merit to this claim. Robert and George have not established a genuine issue of fact to show that the police misled the state court judge, much less that they did so deliberately or recklessly or that any errors were material to establishing probable cause. Accordingly, I grant defendants' motion for summary judgment.

1

**Background**

In light of the standards governing a motion for summary judgment, the following facts are undisputed or, if disputed, are stated in the light most favorable to plaintiffs.[1] On January 15, 2009, Robert called Todd Shipley, a chaplain who had previously counseled Robert and his family, to vent about problems that Robert was having with his brother Carl. While the precise words that Robert used during his conversation with Shipley are subject to varying accounts, there is no dispute that Robert described mounting problems he was having with Carl and that Robert said something that could be construed as a threat against Carl. Robert maintains that he did not seriously mean what he said and that his words were taken out of context, but Shipley apparently felt otherwise. Shipley called Tom Harrison, a social worker at Bridgeport Mental Health Center who had met with Robert and Carl on prior occasions regarding conflicts in the family, to relay the substance of his conversation with Robert. Harrison in turn called the Bridgeport Police Department, and he told the police dispatcher that Shipley told him that Robert had stated that he might have to kill his brother Carl.

The police dispatched officers John Holtz and Michael Sigrist to a single family home where Robert lived with his brothers Carl and George. Holtz and Sigrist banged on the door, and eventually Robert came to the door and invited the officers inside. Once the officers entered, Robert revealed—much to the surprise of the officers—that he had been holding and hiding a loaded gun behind his body. Robert set the firearm down on a bookcase and stepped away from it.

---

[1] The facts set forth herein do not necessarily include facts relating to legal claims that plaintiffs abandoned at oral argument. In addition to their claims against the individual defendants, plaintiffs' complaint also asserted a claim against the City of Bridgeport solely for injunctive relief—specifically, "for an injunction requiring [the City] to return to the plaintiffs all" the items seized during the search of the property. *See* Doc. #1 at 5. It is undisputed that, in accordance with earlier orders of this Court (*see* Docs. #35, 38), the City of Bridgeport eventually did return the seized property to plaintiffs. At oral argument on defendants' summary judgment motion, plaintiffs abandoned any claims regarding the City's extended retention of the seized property. Accordingly, this ruling addresses only those claims asserted against the individual defendants.

Robert then told the officers that he thought that they were at his home because of something he had said to chaplain Shipley about his brother Carl. He said that Carl was a problem, but that his words to the chaplain had been taken out of context. Robert also told the officers that he and George legally owned and kept many guns in their home (in addition to the gun lying on the bookcase). At some point in the conversation, Robert asked one of the officers if he planned to "zap" him with a Taser, despite the fact that the officer had not given any indication of an intent to do so. According to Robert, this comment was "meant in jest . . . to alleviate any tension in the situation." Doc. #44-3 at 109. After a few minutes, Holtz and Sigrist left the residence.

The officers would later write in an incident report that this encounter with Robert concerned them. While Robert vehemently disputes their characterization, Holtz and Sigrist felt that Robert "appeared agitated, nervous and paranoid" throughout the conversation, and they noted that he "appeared to fluctuate from calm to aggravated while speaking and kept repeating himself." Doc. #44-3 at 20.

After leaving Robert and George's residence, Holtz called Harrison, the social worker who had first notified the police about Robert's comments to Shipley. Harrison reiterated to Holtz the information that he had conveyed to the police dispatcher earlier, and he also said that he was concerned about Robert's state of mind. Based on his meeting with Robert and his conversation with Harrison, Holtz believed that Robert should be detained for a medical examination pursuant to Connecticut General Statutes § 17a-503(a), a Connecticut statute that permits a police officer to take a person into custody for an emergency psychiatric examination if

the officer has reasonable cause to believe that the person is dangerous to himself or others due to psychiatric problems.[2]

That evening, detective Christopher Borona, Sigrist, and other Bridgeport Police officials convened outside Robert's home to observe the scene. A sergeant eventually reached Robert inside the house by telephone, and he instructed Robert to exit his house without a weapon. Robert did so, and he was taken into custody and transported to Bridgeport Hospital for a psychological evaluation. Meanwhile, police officers went into the house with George. They conducted a protective sweep of the home, and George showed them the locations of firearms that were stored there.

The police then decided to obtain a warrant to conduct a full search of the residence and to seize the weapons. Detectives Kimberly Biehn and Joseph Gallagher drafted and signed the warrant application. In the application, Biehn and Gallagher sought permission to seize "[p]istols, rifles, revolvers, handguns, shotguns, projectiles, [and] ammunition," and they claimed that the offenses they were investigating were threatening in the second degree (in violation of Connecticut General Statutes § 53a-62) and reckless endangerment in the first degree (in violation of Connecticut General Statutes § 53a-63). The warrant application basically narrated the day's events: Robert's call to chaplain Shipley, Harrison's call to the police

---

[2] Connecticut General Statutes § 17a-503(a) provides: "Any police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section. The officer shall execute a written request for emergency examination detailing the circumstances under which the person was taken into custody, and such request shall be left with the facility. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under [Connecticut General Statutes §] 17a-502." Holtz executed a written request in accordance with the statute. In that written request, Holtz described the basis for his reasonable cause determination as follows: "[Robert] stated to family reverend earlier in the day that the only way to settle a dispute with his brother was to shoot him. [Robert] met responding officers at the front door of his home with a loaded 45-caliber handgun and told responding officers there were numerous weapons in the house. Responding officers spoke with social worker from Bridgeport Mental Health who was handling [Robert]'s dispute with his brother. Social worker stated that he called the Bridgeport Police about [Robert]'s statement to the reverend because he feared [Robert] might shoot his brother and kill him." Doc. #44-3 at 173.

reporting Shipley's account of his conversation with Robert, Holtz and Sigrist's visit to the residence, officers taking Robert into custody, and the protective sweep of the residence. The warrant application did not, however, specifically state that Robert had been taken into custody for an emergency psychiatric examination. Biehn and Gallagher wrote only that "Robert August was taken into custody, without incident." Doc. #44-3 at 187. Biehn and Gallagher concluded their warrant application by stating that they had "reason to believe that a complete and competent examination of 285 East Pasadena Place [Robert and George's home] is needed to locate, document, and seize items of physical evidence to further assist in this investigation." *Id.*

After a state court judge signed the warrant, the police thoroughly searched the home, and they seized 48 weapons and magazines and ammunition belonging to Robert and George. They also seized a display case containing antique firearms, grenades, several knives, a bayonet, and a booby trap. *See* Doc. #44-3 at 193-95.

Less than 24 hours after being taken into custody outside his house, Robert was released from the hospital. Upon his return home, Robert found that the officers who conducted the search the prior evening had turned "[t]he whole house . . . upside down. The place was a mess. Stuff was all over the place." Doc. #44-3 at 133.

Neither Robert nor George was ever charged with any wrongdoing. Nothing came of the police investigation, and a few months later the investigation was officially closed. Detective Borona's case disposition form simply states: "No Crime – Mentally Defective Person." Doc. # 44-3 at 209.

The following year, plaintiffs Robert and George initiated this civil rights action against the City of Bridgeport as well as police officials including Biehn, Borona, Gallagher, Holtz, and Sigrist. Defendants have moved for summary judgment. At oral argument on defendants'

motion, plaintiffs abandoned many of the claims asserted in the complaint. According to plaintiffs' counsel, the only remaining claims pertain to allegations that defendants (1) procured the warrant by means of omissions and misstatements, (2) seized items outside the scope of the warrant, and (3) conducted the search in an unreasonably destructive manner.

### Discussion

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Gr., LLC,* 737 F.3d 834, 843 (2d Cir.2013) (quoting *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g., Tolan,* 134 S.Ct. at 1866; *Caronia v. Phillip Morris USA, Inc.,* 715 F.3d 417, 427 (2d Cir.2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan,* 134 S.Ct. at 1866 (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).

Although plaintiffs do not dispute that the police had a warrant to search their home, they contend that the police secured the warrant by means of misrepresentations and omissions. To prevail on this kind of claim, a plaintiff "is required to show: (1) 'that there were intentional and material misrepresentations or omissions' in the warrant affidavit, and (2) that the 'alleged

falsehoods or omissions were necessary to the . . . probable cause finding.'" *United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014) (quoting *United States v. Awadallah*, 349 F.3d 42, 64-65 (2d Cir. 2003)); *see also Velardi v. Walsh*, 40 F.3d 569, 573-75 (2d Cir. 1994) (applying same standard under *Franks v. Delaware*, 438 U.S. 154 (1978) in civil liability context under 42 U.S.C. § 1983).

It is not enough for plaintiffs simply to show that there were errors in an affidavit, because "misstatements or omissions caused by 'negligence or innocent mistake[s]'" do not satisfy the *Franks* standard to establish a violation of the Fourth Amendment. *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013) (quoting *Franks*, 438 U.S. at 171). Instead, it must be shown that any misrepresentations or omissions were "*designed to mislead*, or that [they] were] made in *reckless disregard of whether they would mislead*." *Id.* at 154 (quoting *Awadallah*, 349 F.3d at 68) (emphasis in original).

Moreover, it must also be shown that the alleged misrepresentations or omissions were cumulatively material, as adjudged by "determin[ing] if the false [or omitted] information was necessary to the issuing judge's probable cause determination." *Awadallah*, 349 F.3d at 64. This is done by hypothesizing a "corrected affidavit"—an affidavit that has been corrected to rectify any false statements and that includes any omitted information—to determine if the affidavit as corrected would suffice to establish probable cause. *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000). "Disputed issues are not material if, after crossing out any allegedly false information and supplying any omitted facts, the 'corrected affidavit' would have supported a finding of probable cause." *Velardi*, 40 F.3d at 573-74 (citations omitted).

With this framework in mind, it is clear that plaintiffs' claims regarding misrepresentations and omissions in the warrant application cannot withstand summary

judgment. To begin with, there is no genuine issue of factual misrepresentations in the warrant application—let alone any deliberate or reckless misrepresentations. The only alleged misrepresentation plaintiffs point to is the affiants' claim that Robert stated to Shipley that he "want[ed] to kill his brother" or "was going to kill his brother." Contrary to plaintiffs' claim, the affiants had an ample factual basis for this statement in view of the undisputed fact that Harrison called the police to report that he was contacted by Shipley and that Harrison told the police dispatcher that Shipley informed him that Robert said that he "might have to kill his brother." *See* Doc. # 44-1 (Defendants' Local Rule 56(a)1 Statement), ¶ 32.[3] Even assuming that the officers' characterization that Robert said he "*wanted* to" or "*was* going to" kill his brother—as opposed to that he "*might* have to" kill his brother—were considered a misrepresentation, plaintiffs have made no showing that the statement was designed to mislead or was made in reckless disregard of whether it would mislead.

Nor have plaintiffs created a genuine fact issue about alleged omissions from the warrant application. They contend that the officers knew at the time they drafted the warrant application that this was strictly a psychiatric case—and not a criminal case—and that they concealed this fact from the issuing judge. I recognize that the warrant application could have been more explicit about the fact that Robert had been taken into custody for a mental health evaluation. Nevertheless, it cannot be said that the warrant application concealed the psychiatric nature of the case. To the contrary, the application explained that police involvement with the August family was precipitated by a call from Bridgeport Mental Health Center, and that Holtz and Sigrist were sent to the August home on a "well being check." Doc. #44-3 at 185. Moreover, the

---

[3] These may or may not be the words that Robert said to Shipley. Other evidence indicates that Robert said that "the only way to settle a dispute with his brother was to get rid of him" or that "the only way to settle a dispute with his brother was to shoot him." *See* Doc. #44-3 at 19, 173. Robert does not remember precisely what he said to Shipley, although—most significantly—he readily concedes that it could have been construed as a threat against Carl. *See id.* at 86.

application noted that Robert was "agitated" and "paranoid." *Id.* at 185-86. The inclusion of this psychiatric-related information dispels any plausible inference that the officers deliberately or recklessly concealed the psychiatric nature of the case.

Even if plaintiffs could demonstrate any deliberate or reckless misrepresentations or omissions, summary judgment would still be appropriate because the alleged misrepresentations or omissions were not material to the probable cause determination. A hypothetical "corrected" warrant affidavit—specifying that Robert stated that he "might have to" kill Carl and that Robert was taken into custody for a psychiatric evaluation—would have set forth facts demonstrating a fair probability that Robert had committed the crime of threatening in the second degree in violation of Connecticut General Statutes § 53a-62.[4] In view of Robert's statement to chaplain Shipley about potentially having to kill his brother Carl and the collection of firearms in the house where both Robert and Carl lived, there was an adequate factual basis to determine that Robert had made a threat of violence against Carl in reckless disregard of whether that threat would scare or frighten Carl, and there was similarly a fair probability that evidence of that crime—in the form of numerous firearms and weapons—would be found at the home.

Nor is probable cause vitiated by the fact that the officers may have been concerned about the situation mostly because of their perception that Robert was mentally unstable and could commit an act of violence against his brother Carl or others in the future. It is well established that, so long as an officer's actions are objectively reasonable under the Fourth Amendment, the officer's "subjective motives"—be it to "gather evidence . . . or to . . . prevent future violence"—are irrelevant. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404-05 (2006). It

---

[4] Connecticut General Statutes § 53a-62 provides in relevant part: "(a) A person is guilty of threatening in the second degree when: (1) By physical threat, such person intentionally places or attempts to place another person in fear of imminent serious physical injury, (2) such person threatens to commit any crime of violence with the intent to terrorize another person, or (3) such person threatens to commit such crime of violence in reckless disregard of the risk of causing such terror."

matters not if the officers here hoped to prevent a future violent crime, not merely to gather evidence for prosecution of any past crimes.

Plaintiffs further contend—both in their memorandum in opposition to summary judgment and at oral argument—that defendants seized items outside the scope of the warrant and conducted the search in an unreasonably destructive manner. But plaintiffs' complaint makes no mention of such allegations. It is axiomatic that the allegations in a complaint must give defendants "fair notice" of what claims are at issue. *See, e.g.*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). A party may not "raise new claims for the first time in submissions in opposition to summary judgment." *Mutts v. S. CT State Univ.*, 2006 WL 1806179, at *7 (D. Conn. 2006) (citation and internal quotations omitted), *aff'd sub nom. Mutts v. S. Connecticut State Univ.*, 242 F. App'x 725 (2d Cir. 2007); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (refusing to consider allegation first mentioned in opposition brief to motion to dismiss); *Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.*, 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) (refusing to consider claim discussed in opposition brief to summary judgment motion but "never addressed . . . in the complaint").

## Conclusion

For the reasons set forth above, defendants' motion for summary judgment is **GRANTED**. The Clerk is directed to close this case.

It is so ordered.

Dated at Bridgeport this 26th day of September 2014.

/s/
Jeffrey Alker Meyer
United States District Judge